Leslie A. HARRISON, Plaintiff,

v.

Banque INDOSUEZ, Jean–Claude Gruffat
and Norbert Graetz, Defendants.

No. 94 CIV. 6763(PKL).

United States District Court,
S.D. New York.

May 20, 1998.

Michael F. Fitzgerald, New York City, for Plaintiff.

Epstein, Becker & Green, P.C., New York, Stuart M. Gerson, of counsel, for Defendants.

## OPINION AND ORDER

LEISURE, District Judge.

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendants Banque Indosuez (the "Bank"), Jean–Claude Gruffat ("Gruffat"), and Norbert Graetz ("Graetz") move for partial summary judgment in the instant matter. For the reasons stated below, defendants' motions are granted in part and denied in part.

## BACKGROUND

In October of 1981, Leslie A. Harrison ("Harrison" or plaintiff) joined the Bank as a trader on the Bank's Money Market Desk. Graetz became her supervisor in September of 1989, and upon Graetz's recommendation, the Bank promoted Harrison to First Vice President. Harrison was highly successful in her trading activity and brought large profits to the Bank.

For the years 1989 and 1990, plaintiff's base salary was $132,000, and for 1991–1994, her base salary was $155,000. She also received significant bonuses that related to the Bank's performance during those years. Her bonuses ranged from a low of.$120,940 in 1989 to a high of $4,164,400 in 1992.

In 1991, Harrison experienced flashbacks of childhood sexual abuse and began therapy shortly thereafter. She received therapy from Arlene Portada from April, 1991, until late 1992, and also received therapy by telephone from a therapist in California, Penny Joss Fletcher.

In the fall of 1993, plaintiff asked Graetz for a leave of absence from the Bank so that she could check into a psychiatric clinic in

Arizona. The cause of Harrison's depression is in dispute. Defendants claim that the memories of sexual abuse, coupled with her discovery during this time period that the married man with whom she was having an affair, Ralph Maiano, was seeing another woman, caused her depression. Plaintiff contends that her depression was caused, at least in part, by Graetz's sexual harassment of her. She claims that shortly after his arrival at the Bank in 1989, Graetz commenced a pattern of inappropriate and offensive behavior toward her and others. Harrison alleges that Graetz massaged her shoulders without permission on numerous occasions, showed pornographic films on the trading room television set, displayed sex toys on his office desk, played strip poker on his office computer while plaintiff was present, described sexual acts with his girlfriend to plaintiff, and commented on Harrison's body and whether he wanted to have sex with her.

Graetz granted Harrison's request for a leave of absence, and, with Harrison's knowledge, informed the Bank that Harrison needed time to attend to family matters. Following a short stay in Arizona, Harrison returned to New York and began therapy with Dr. Joseph Martorano, a psychiatrist, and Laurie McDonald, a therapist. She contacted Graetz, told him that the treatment in Arizona did not work for her, that she was under the care of therapists in New York, and that she needed more time before she could return to the Bank.

Harrison and Graetz met for dinner on December 1, 1993. Graetz contends that at that dinner, they came to an understanding that Harrison would go on disability, a situation that did not preclude her return to the Bank. The defendants argue that they suggested this option to plaintiff in order to protect her own interests. The short-term and long-term disability plans at the Bank, as well as a special executive supplemental disability policy for which plaintiff was eligible, would have provided Harrison with large sums of money for the length of her expected working life. Harrison alleges that the first mention of going on a disability status was at this meal. She claims that she was resistant to the idea because she needed only a few weeks until she could return to work.

That same evening, plaintiff raised the issue of her bonus payment for 1993. She did not want to forfeit her bonus payment for the year (approximately $1.7 million), and sought a guarantee that she would receive that money. Graetz indicated that he needed to speak to Gruffat before he could provide an answer. The parties agree that Graetz informed plaintiff the next day, December 2, 1993, that the Bank guaranteed her bonus payment, and the Bank subsequently paid her this money. At a dinner on December 2, 1993, attended by personnel in the Bank's Money Market Desk, Graetz announced that plaintiff was taking disability leave and that she would be welcome back at the Bank anytime she was ready to return.

Graetz prepared a letter dated December 2, 1993, which plaintiff signed. The letter stated:

> The present serves to inform you that with today's date I am returning from my leave of absent (sic). Unfortunately I'm not in the position to return to my duties at the bank, due to a severe illness.

Plaintiff Exh. 12. The Bank claims that in order to begin disability status, Harrison needed to end her leave of absence. Harrison argues that the letter was tantamount to a forced resignation due to her disability. She contends that she spoke to Graetz twice on December 2 and that he indicated in both conversations that he did not yet have Gruffat's assurance that the Bank would pay her bonus for 1993. Plaintiff alleges that she told Graetz that she refused to sign any document, and that unless she received her bonus payment, she would return to work the following Monday. According to plaintiff, Graetz told her that if she did not sign the letter, things would get "very, very messy." Plaintiff Exh. 13. Harrison also claims that in the fall of 1993, Gruffat had told Graetz that "he didn't want a nut case in his trading room." Plaintiff Exh. 15. Finally, plaintiff claims that she did not sign the letter until December 6, 1993. Not surprisingly, the defendants dispute Harrison's allegations. They claim that Harrison willingly signed the

letter on December 2, and deny issuing any ultimatums.

On December 13, 1993, Dr. Martorano completed a short-term disability form for plaintiff. The form fixes November 1, 1993 as the date Harrison became unable to work because of her disability, and indicates June 1, 1994 as the estimated time of return. The form also states that plaintiff's disability was not the result of injury arising out of and in the course of employment. In early 1994, plaintiff contacted the Bank's Human Resources department to inform them that she was not going to apply for long-term disability. On February 8, 1994, the Bank received a letter from plaintiff's attorney, alleging that the Bank forced plaintiff to take disability and that Graetz sexually harassed plaintiff. On March 2, 1994, plaintiff, without solicitation, returned to the Bank her employee ID, access card, and corporate credit card. Finally, the Bank informed plaintiff on April 15, 1994, that, in view of the return of the cards and her stated intention not to return to the Bank, she was deemed to have abandoned her job.

Harrison's allegations concerning sexual harassment and her departure from the Bank form the basis of her claims under Title VII of the Civil Rights Act of 1964, as amended, Title 42, United States Code ("U.S.C."), Section 2000e et seq., the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 et seq., New York Executive Law § 296(HRL), New York City Administrative Code § 8–107 (N.Y.CAC), and common law claims of intentional infliction of emotional distress and breach of fiduciary duty.

In addition, Harrison claims that the Bank breached her contract. She alleges that she and the Bank were parties to an employment agreement that permitted the Bank to terminate her employment only for cause. Harrison points to four separate documents that she argues formalizes this agreement. The first document is a letter agreement dated September 30, 1981, which sets her start date as October 15, 1981, with a probationary period of three months, "during which time either party may terminate the relationship for whatever reason by giving one week's notice." Plaintiff's Exh. 22. The letter concludes, "We are looking forward to a long and mutually rewarding association and welcome you to the IndoSuez network." Id. Harrison contends that the cited language indicates that the parties did not have a traditional "at will" employment relationship and that the Bank could fire her only for cause.

Plaintiff also argues that three separate bonus agreements, which covered the years 1990–1993, support her contract claims. Plaintiff alleges that because the agreement for 1992–1993 stated "[i]f you resign or the Bank terminates your employment for 'cause' (i.e., gross negligence or willful misconduct), you will forfeit your right to any remaining Deferred Bonus," the Bank could not dismiss her at will. Additionally, Harrison contends that the strict formula-based nature of the bonus structure, coupled with the expectation that bonuses are the main form of compensation for a trader, indicates that the bonus agreement served as an employment contract that did not permit at will dismissal.

All defendants move for summary judgment as to plaintiff's claims under the ADA and NYCAC, as well as the contract causes of action. Additionally, defendants Graetz and Gruffat seek dismissal of the Title VII, HRL, and common law tort claims against them. Defendants also seek a ruling that plaintiff's failure to mitigate her damages serves as a bar to her recovery of front and back pay.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, it is this Court's responsibility "not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986). Nonetheless, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Id.* at 325, 106 S.Ct. 2548 (internal citations omitted). "The burden on the moving party may be discharged by showing ... that there is an absence of evidence to support the non-moving party's case." *Id.* (internal citations omitted). The burden of demonstrating the existence of a genuine issue of material fact then shifts to the non-moving party. *See id.* at 322–23, 106 S.Ct. 2548. The non-moving party may not rely solely on its pleadings nor on conclusory factual allegations in satisfying this burden. *See Gray v. Darien*, 927 F.2d 69, 74 (2d Cir.1991). The non-moving party instead must offer specific evidence supporting its claim that there exists a genuine issue of material fact. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. In demonstrating that the factual issue in dispute is "genuine", the non-moving party must offer evidence to allow a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. INDIVIDUAL LIABILITY UNDER TITLE VII AND THE ADA

■ Harrison alleges that defendants Graetz and Gruffat violated Title VII and the ADA. However, the United States Court of Appeals for the Second Circuit has determined that "an employer's agent may not be held individually liable under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995). The Second Circuit has not addressed whether employees may be held per-

sonally liable under the ADA; however, as Title VII and the ADA define "employer" identically, the Court's holding in *Tomka* clearly supports the rejection of personal liability under the ADA as well. *See Cerrato v. Durham*, 941 F.Supp. 388, 395 (S.D.N.Y. 1996); *see also Lane v. Maryhaven Center of Hope*, 944 F.Supp. 158, 162 (E.D.N.Y.1996).

■ Plaintiff additionally argues that Graetz and Gruffat are subject to Title VII and ADA liability in their official capacities. The Hon. John S. Martin, Jr., U.S. District Judge of this Court, encountered this same argument in *Bakal v. Ambassador Constr.*, 94 CIV. 584(JSM), 1995 WL 447784 (S.D.N.Y. July 28, 1995). In a thorough and scholarly analysis of the issue, Judge Martin noted that "official capacity" suits have "traditionally been permitted to avoid Eleventh Amendment and sovereign immunity problems that might arise if a plaintiff were to sue a government entity directly." *Id.* at *4. Judge Martin concluded that since employers are subject to suit under Title VII, "There is no need for such 'official capacity' litigation." *Id.; see also Gray v. Shearson Lehman Bros., Inc.*, 947 F.Supp. 132, 136 (S.D.N.Y. 1996) (Mukasey, J.); *Brooks v. Hevesi*, 95 Civ. 3209(JSM), 1998 WL 32712, *1 (S.D.N.Y. Jan. 29, 1998). This Court agrees with the teaching of these cases. Accordingly, the Court dismisses the Title VII and ADA claims against Graetz and Gruffat.

## III. PLAINTIFF'S ADA CLAIM AGAINST THE BANK

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

■ Harrison contends that the Bank improperly discharged her. Her Complaint alleges that "[p]laintiff was terminated because Defendants knew or perceived that she had a disability." Complaint at ¶ 36. In order to establish a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must

show that (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without a reasonable accommodation; and (4) she was discharged because of her disability. *See Reeves v. Johnson Controls World Servs., Inc.,* No. 97–7685, 1998 WL 131279, *4 (2d Cir. March 20, 1998); *see also Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998). The Bank contends that it is entitled to summary judgment as to plaintiff's ADA claim because (1) she could not perform the essential functions of her job as a trader, and (2) she was not discharged.

### A. Is Plaintiff "Qualified" Under the ADA?

■ A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

At her deposition, plaintiff answered in the negative when asked, "Following your return from Arizona, did there ever come a time when you felt you were able to resume your duties at Banque Indosuez?". The Bank argues that this admission entitles them to summary judgment as to the ADA claim. However, at the same deposition, plaintiff responded in the affirmative when asked, "Were you physically able to work on January 1, 1994?", and stated that she did not need recovery time in 1994. Harrison explains that her answer to the first question simply indicated that she did not wish to return to the allegedly hostile and abusive environment at the Bank. The deposition testimony indicates that a material issue of fact exists as to whether plaintiff is "qualified" under the ADA; thus, summary judgment is inappropriate on this claim.

### B. Did the Bank Discharge Plaintiff?

■ One of the elements of a *prima facie* case of discriminatory discharge is that the employee was discharged. *See* 42 U.S.C. § 12112. This element may be satisfied by a showing of actual or constructive discharge. *See Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996); *see also Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993) (Kearse, J.). A review of the record indicates that the Bank did not *actually* discharge plaintiff. In the fall of 1993, Harrison approached Graetz about taking a leave of absence. After plaintiff returned from her stay at the clinic in Arizona, Graetz indicated that the Bank felt that she should take disability leave. Following her return from the leave of absence in early December, 1993, plaintiff and her psychiatrist completed the forms necessary to place plaintiff on short-term disability. In early 1994, Harrison indicated that she would not seek to apply for long-term disability benefits, nor would she return to the Bank.

■ The Court determines that there is a genuine issue of material fact concerning whether the Bank forced plaintiff into taking a disability status. There is no genuine issue of fact, however, concerning whether the Bank actually discharged plaintiff. The disability plans at the Bank unquestionably provided that Harrison could have resumed her employment at any time if her condition improved. Plaintiff chose not to convert her short-term disability status into long-term and chose not to return to the Bank.[1]

Harrison contends that the Bank's desire for her to accept disability status was tantamount to a forced resignation, and thus constituted a constructive discharge. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova,* 92 F.3d at 89; *see also Spence,* 995 F.2d at 1156. "Working conditions are intolerable if they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Chertkova,* 92 F.3d at 89 (quoting *Lopez v.*

---

1. This decision was potentially very costly for plaintiff. Under the various disability plans at the Bank, Harrison was eligible to receive as much as $37,200 for two years, plus additional benefits of $270,000 per year through the remainder of her expected working life—a sum equal to as much as $5.7 million.

*S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987)).

In considering whether the Bank constructively discharged plaintiff because of her disability, the Court looks only at the circumstances that led to her departure. As the Court determines, *supra*, there is an issue of fact as to whether the Bank forced plaintiff to assume disability status. Harrison also alleges that Gruffat stated that "he didn't want a nut case in his trading room," and Graetz told her that things would get "messy" if she did not take disability leave. Finally, in her deposition, Cherry Rico, Graetz's secretary, testified that Graetz told her that plaintiff would not return to her job.

The Court examines the evidence of adverse working condition in a cumulative manner, as opposed to singularly. *See Chertkova*, 92 F.3d at 90. Even cumulatively analyzed, the evidence in plaintiff's favor is slim. However, the Second Circuit has explained that the plaintiff's burden of establishing a *prima facie* case in a discrimination suit is *de minimus*.[2] *See id.; see also Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Although the Court believes that plaintiff's claims of constructive discharge are not strong, a reasonable juror could determine that the Bank forced her to resign. Accordingly, summary judgment on plaintiff's ADA claim is inappropriate.

## IV. PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT

Plaintiff claims that she was not an employee "at will", and the Bank could only terminate her employment "for cause". She points to language in her initial letter agreement with the Bank in 1981, as well as her bonus agreements from 1990–93, which specifically include mention of termination for cause. She argues that as long as the Bank remained in the money market field, it owed her employment until she reached the age of 65. The Bank argues that Harrison was an at will employee, and therefore plaintiff's claims for breach of contract must fail.

Absent an agreement establishing a fixed duration, an employment relationship in New York is presumed to be a hiring at will, terminable at any time by either party. *See De Petris v. Union Settlement Association, Inc.*, 86 N.Y.2d 406, 633 N.Y.S.2d 274, 276, 657 N.E.2d 269 (1995) (Kaye, C.J.); *see also Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919 (1987). New York neither recognizes a tort for wrongful discharge nor requires good faith in the employment relationship. *See DePetris*, 633 N.Y.S.2d at 276, 657 N.E.2d 269; *see also Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 233, 448 N.E.2d 86 (1983). An employee may rebut the presumption of at will employment, however, by establishing that the employer made the employee aware of its express written policy limiting its right of discharge and that the employee detrimentally relied on that policy in accepting the employment. *See DePetris*, 633 N.Y.S.2d at 276, 657 N.E.2d 269.

Plaintiff claims that her employment agreement was of a fixed duration (until she reached age 65) and that the presumption of at will employment therefore is inapplicable to her. Harrison's claim is frivolous and merits only brief attention. The initial employment agreement contains absolutely no mention of any age restriction; nor do any of the bonus agreements. Additionally, Harrison has provided no other evidence that her employment was guaranteed until she reached age 65. In her deposition, she stated only that "[i]t is my belief that as long as I performed for the bank and didn't do anything that was wrong, that they would keep me." When asked immediately thereafter, "Is there any specific term that you can describe that involved that chronology?", she answered, "Until 65." Def. Exh. A. While plaintiff may have believed that her agreement entitled her to a position until age 65,

---

**2.** Additionally, the Second Circuit's recent decision in *Gallagher v. Delaney*, 139 F.3d 338 (2d Cir.1998) seems to indicate a preference in discrimination suits for allowing juries to evaluate the conduct at issue. "An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury." *Id.* at 347.

there is nothing contained in the agreement to indicate any term of definite duration. Accordingly, the Court presumes that her employment with the Bank was at will.

In order to overcome this presumption, Harrison must show that the Bank expressly limited its right to terminate her employment and that she detrimentally relied on the limitation in accepting the position. Plaintiff has not satisfied either condition. The initial 1981 agreement states:

> Starting date of employment has been fixed at October 15, 1981. The probation period is three months, during which time either party may terminate the relationship for whatever reason by giving one week's notice. . . .

> We look forward to a long and mutually rewarding association and welcome you to the IndoSuez network.

Plaintiff's Exh. 22. Harrison maintains that the Bank necessarily, by negative implication, limited its right to terminate plaintiff following the probation period. The Court disagrees. The probation period does not indicate an *express* intention on the part of the Bank to alter the at will status of Harrison. *See Wolde–Meskel v. Vocational Instruction Project Community Servs., Inc.,* 950 F.Supp. 101, 104 (S.D.N.Y.1997) (90–day probationary period not limitation on employer's ability to terminate employment at will). Likewise, the language regarding "a long and mutually rewarding association" does not indicate in any way a limitation of the Bank's ability to terminate the relationship at will. Harrison also has provided no evidence that she detrimentally relied upon this purported limitation when she accepted employment with the Bank.

■■■■■] Included in the bonus agreement for 1992–93 was the following language: '

> If you resign or the Bank terminates your employment for "cause" (i.e., gross negligence or willful misconduct), you will forfeit your right to any remaining Deferred Bonus.

Plaintiff Exh. 22. Harrison argues that this language prevents the Bank from terminating her except "for cause". Once again, the Court disagrees. The language contains no such limitation, but simply indicates the status of her deferred bonus should the Bank terminate her for cause, as opposed to without cause. This provision clearly is not the express limitation of the Bank's rights needed to overcome the presumption of at will employment. The Court therefore grants summary judgment to the Bank as to plaintiff's claims for breach of contract.[3]

## V. PLAINTIFF'S HRL AND NYCAC CLAIMS AGAINST GRUFFAT

Gruffat argues that the Court should grant summary judgment as to the HRL and NYCAC claims against him. He claims that he is liable neither as an "employer" nor as an "aider and abettor" under the HRL, and that the lack of evidence of his involvement in any discrimination of plaintiff, coupled with the alleged failure of Harrison to satisfy certain statutory preconditions, likewise mandate dismissal of the NYCAC claims.

### A. HRL Claims

#### 1. Primary Liability as an Employer

■■■] HRL § 296(1) provides:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1)(a) (McKinney's 1993). The New York Court of Appeals has determined:

> A corporate employee, though he has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination based on age or sex under

---

**3.** The parties briefed the issue of whether Harrison could obtain lost future bonus payments as damages for her breach of contract claim. As the Court dismisses Harrison's contract claims, it does not reach the damages issue.

New York's Human Rights Law (Executive Law, art. 15) ... if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others.

*Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984); *see also Tomka,* 66 F.3d at 1317. There is no dispute that Gruffat, as a senior officer at the Bank, had the power to do more than carry out personnel decisions made by others. Thus, he may be individually liable under the HRL as an employer.[4]

The remaining issue is whether plaintiff has provided enough evidence that Gruffat violated the HRL to survive a motion for summary judgment. Harrison alleges that Gruffat violated the HRL by discharging her on the basis of her disability and by discriminating against her on the basis of her sex. The Court determines, *supra,* that plaintiff has made a *prima facie* showing that the Bank discharged her in violation of the ADA. As there is evidence that Gruffat was an active participant in the events that led to Harrison's departure, summary judgment on the portion of plaintiff's HRL claim that alleges discrimination based on her disability is inappropriate.

■ There is no evidence, however, that Gruffat sexually harassed Harrison. Plaintiff claims only that she told Gruffat of Graetz's conduct, and Giselle Iral, one of plaintiff's co-workers at the Bank, states that Graetz's inappropriate behavior was well-known to Gruffat. Gruffat's lack of active participation in any sexual harassment of Harrison precludes a finding that he violated § 296(1).[5]

### 2. *"Aider and Abettor" Liability*

■ Section 296(6) of the HRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6) (McKinney's 1993). The *Tomka* Court distinguished *Patrowich* and held that under § 296(6), a defendant who actually participates in the conduct that gives rise to a discrimination claim may be held personally liable under the HRL, regardless of the defendant's status in the corporation. *See Tomka,* 66 F.3d at 1317; *see also Steadman v. Sinclair,* 223 A.D.2d 392, 393, 636 N.Y.S.2d 325, 326 (1st Dep't 1996); *Peck v. Sony Music Corp.,* 221 A.D.2d 157, 158, 632 N.Y.S.2d 963, 963 (1st Dep't 1995); *but see Foley v. Mobil Chem. Co.,* 170 Misc.2d 1, 11–12, 647 N.Y.S.2d 374, 380–81 (N.Y. Sup.Ct. Monroe Co.1996). The Court determines, *supra,* that Harrison has made a sufficient showing of discriminatory conduct by Gruffat to survive summary judgment as to the portion of the HRL claim based on her disability; plaintiff has failed to make this showing as to the portion of the HRL claim based on sexual harassment. Accordingly, the Court dismisses plaintiff's HRL cause of action against Gruffat to the extent that it alleges sexual harassment.

### B. *NYCAC Claims*

The NYCAC provides:

It shall be an unlawful discriminatory practice: For an employer or an employee or agent thereof because of the actual or perceived ... gender, disability ... of any person ... to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Administrative Code § 8–107.

■ As the NYCAC specifically allows for employee liability, there is no question that

---

4. Although the *Patrowich* decision refers only to age and sex discrimination, it is clear form the language of the statute that the threshold requirements for individual liability under the HRL for discrimination based on disability are the same.

5. Under a theory of vicarious liability, New York courts recognize that an employer may be held liable for the conduct of its employees, if the employer "became a party to [the discrimination] by encouraging, condoning, or approving it".

*Totem Taxi, Inc. v. New York State Human Rights Appeal Bd.,* 65 N.Y.2d 300, 491 N.Y.S.2d 293, 295, 480 N.E.2d 1075 (1985); *see also State Div. Of Human Rights v. St. Elizabeth's Hosp.,* 66 N.Y.2d 684, 496 N.Y.S.2d 411, 412, 487 N.E.2d 268 (1985). Although Gruffat satisfies the *Patrowich* test and is an "employer" for purposes of determining his individual liability under the HRL, he is not vicariously liable for the conduct of Graetz.

the law is applicable against Gruffat in his individual capacity. The parties also do not dispute that the standard of proof required under the NYCAC is the same as that required under the HRL. *See Shane v. Tokai Bank, Ltd.*, Nos. 96 CV 5167(HB), 96 CV 8351(HB), 1997 WL 639255, *3 (S.D.N.Y. Oct. 15, 1997). Therefore, the Court grants summary judgment to Gruffat as to plaintiff's NYCAC claim to the extent that she alleges sexual harassment.

■ Gruffat additionally argues that defendants are entitled to summary judgment on the NYCAC claims because Harrison failed to comply with a statutory prerequisite to filing the NYCAC cause of action. Section 8–502(c) of the New York City Administrative Code requires that "[p]rior to commencing a civil action [under the New York City Human Rights Law] ... the plaintiff shall serve a copy of the complaint upon the city commission on human rights and the corporation counsel." N.Y.C. Administrative Code § 8–502(c). Plaintiff has failed to serve her Complaint in the manner required by § 8–502(c). However, the majority of Courts in this District, as well as the New York Appellate Division, have concluded that the requirements of § 8–502(c) are not a condition precedent to suit. *See McNulty v. New York Dep't of Finance*, 941 F.Supp. 452, 461–62 (S.D.N.Y.1996) (majority of courts favor permissive reading of § 8–502(c)); *see also Bernstein v.1995 Associates*, 217 A.D.2d 512, 516, 630 N.Y.S.2d 68, 72 (1st Dep't 1995). The Court finds the reasoning of the majority persuasive. Accordingly, the Court will not dismiss the remaining NYCAC claims against the defendants.

## VI. REMAINING CLAIMS

■ Graetz and Gruffat contend that Harrison has abandoned the remaining claims she asserted in her Complaint, for intentional infliction of emotional distress and breach of fiduciary duty. In support of this argument, they rely solely on the following passage from Harrison's deposition:

Q. So that your allegations—again; if I am wrong about this, correct me. It is my job to find out what you think, not to tell you what to think. You have now identified three things, one, that you were sexually harassed by Mr. Graetz in the manner you have described earlier, two, that you believe the bank discriminated against you by virtue of your disability in the manner you have testified about today, and three, that the bank breached a contract to you by not employing you until you were 65 years old as long as they stayed in the line of business in which you were involved?

Mr. Fitzgerald: Objection.

Q. Are those accurate summaries on my part?

Mr. Fitzgerald: I am going to object to the characterizations.

Q. You can answer.

A. Yes.

They also breached part of my last contract, bonus agreement.

Def. Exh. A. The defendants contend that this answer indicates that Harrison has abandoned her claims of intentional infliction of emotional distress and breach of fiduciary duty. However, those claims arise directly from the conduct that Harrison alleges; namely, that Graetz and Gruffat sexually harassed her and discharged her from the Bank because of her disability. This Court will not grant summary judgment to the defendants on these claims simply because Harrison, a non-lawyer, did not use the terms "intentional infliction of emotional distress" and "breach of fiduciary duty" in her deposition testimony. Accordingly, the defendants' motion is denied.

## VII. SUPPLEMENTAL JURISDICTION

Based on the consideration of the defendants' motions, the causes of action that remain are claims under Title VII and the ADA against the Bank, HRL and NYCAC claims against all defendants for discrimination based on disability, HRL and NYCAC claims against the Bank and Graetz for sexual harassment, and claims for intentional infliction of emotional distress and breach of fiduciary duty against Graetz and Gruffat. Graetz and Gruffat move for the Court to decline to exercise supplemental jurisdiction and to dismiss the remaining claims against them. The Court denies the motion.

 The Court has original jurisdiction over the Title VII and ADA claims, and because the remaining claims clearly are "so related" to the these causes of action that they form part of the same case or controversy, the Court has supplemental jurisdiction. 28 U.S.C. § 1367(a). In *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court explained that a federal court has jurisdiction over an entire action, including the state-law claims, whenever the federal claims and state claims "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." The Court dismisses, *supra*, the Title VII and ADA claims against Graetz and Gruffat individually. In this situation, the Court still has the power under 28 U.S.C. § 1367 to exercise supplemental jurisdiction over the other claims. *See Mizuna, Ltd. v. Crossland Federal Sav. Bank*, 90 F.3d 650, 657 (2d Cir.1996); *see also Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 254 (2d Cir.1991). However, it is also within the Court's discretion to remand the claims to state court. *See* 28 U.S.C. § 1367(c); *see also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

"[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant state-law claims." *Cohill*, 484 U.S. at 350, 108 S.Ct. 614. Although no federal claims remain against Graetz and Gruffat, Title VII and ADA claims still are pending against the Bank. As Graetz and Gruffat clearly are the focal point of Harrison's allegations, any determination of the Title VII and ADA claims necessarily will involve resolution of the allegations that form the basis of the state law claims against Graetz and Gruffat. The remaining claims against all defendants unquestionably derive from the same nucleus of operative fact such that the factors of judicial economy, convenience, and fairness weigh in favor of one forum. Accordingly, the Court retains jurisdiction over the state law claims.

## VIII. PLAINTIFF'S ALLEGED FAILURE TO MITIGATE DAMAGES

 The law requires victims of employment discrimination to mitigate their damages. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir.1998). "A discharged employee must 'use reasonable diligence in finding other suitable employment,' which need not be comparable to their previous positions." *Id.* (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 & n. 15, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)). In typical mitigation cases, the employer has the burden of showing that suitable work existed in the marketplace and that its former employee made no reasonable effort to find such work. *See Greenway*, at 52. In *Greenway*, the Second Circuit carved an exception to this typical case. An employer is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment. *Id.* at 54. Defendants seek a ruling from this Court that Harrison has not made any reasonable efforts to mitigate her damages. The Court declines to make such a ruling.

 Harrison testified in her deposition that she mailed resumes to all banks in the United States involved in money market trading, spoke with some of her personal contacts in the industry, and utilized a directory to provide leads on potential employers. While there may have been other techniques Harrison could have utilized in her job search, the Court cannot state that she "made no reasonable efforts" at locating employment. Accordingly, a ruling that Harrison failed to mitigate damages as a matter of law is inappropriate. However, an important issue for the jury at trial, based on the evidence or lack of evidence, will be to determine if plaintiff's efforts constitute proper mitigation.

### CONCLUSION

For the reasons stated above, defendants' motions are HEREBY GRANTED in part and HEREBY DENIED in part. The parties are directed to appear for a pre-trial

conference in Courtroom 18B at 500 Pearl Street on July 10, 1998, at 11:00 a.m.

SO ORDERED.